72238. McCORMICK-MORGAN, INC. v. WHITEHEAD ELECTRIC COMPANY.
(345 SE2d 53)

BIRDSONG, Presiding Judge.

McCormick-Morgan, Inc., applicant for a stay of arbitration in the trial court, appeals from a grant of respondent Whitehead Electric Company's application to compel arbitration. McCormick is a California corporation. McCormick designed and was to install a pneumatic system for Republic Airlines at the Hartsfield International Airport in Atlanta, Georgia. The purpose of the pneumatic system was to utilize compressed air traveling in piping to be installed beneath the concrete apron of the airport to provide heating and cooling to Republic's planes parked at passenger gates operated by Republic.

McCormick previously had a working relationship with Whitehead in the Atlanta area and knew that Whitehead would have to use a subcontractor for the concrete work in this contract. Ron Lundstrom, President of Whitehead, called Thomas Williams, Vice-President of McKenney's, Inc., an Atlanta mechanical contractor, to discuss the work necessary for completion of this job. A discussion ensued between representatives of McCormick, McKenney's, and Whitehead and the work proceeded without a written contract. In previous agreements between McCormick and Whitehead, work was done without a written contract until completion of the work, and then agreement was reached and a contract signed. The same procedure was used in the instant case. A pneumatic system had been installed by McKenney's for Piedmont Airlines, and a unit cost basis was reached on the basis of the procedure followed in that contract. There was also a contingency provision in the Piedmont agreement based on whether McKenney's was required to use dowels in the concrete replacement. McKenney's said their estimates for the unit cost

were based on laying the pneumatic system next to the terminal, in a trench 18 inches in width, with removal of old concrete (16 inches in thickness) and removal of stabilized stone underneath the concrete of 12 inches in depth. The airport engineers had approved a method by which concrete could be saw-cut on both sides and removed in slabs 25 feet long, lifted out by a crane. The airport engineers changed their requirements for concrete removal to a method where cuts could be made only at the seam where one concrete slab joined another slab. These concrete slabs overlapped and could not be lifted out by a crane but had to be broken up in place and lifted out in pieces. The replacement concrete had to be supported by dowels with dowel bars drilled into the adjoining section and secured by epoxy. To drill such holes, the trench had to be widened to 36 inches. The length of the trench was increased because it could be placed only along the seams of previously installed concrete slabs, and that line conflicted with Republic's gas fueling pits for its planes. The depth of the old concrete was found to be 22 inches rather than 16 inches, and the stabilized stone was 18 inches in depth, not 12 inches as estimated, and 8-inch slabs were found imbedded in some of the stabilized stone.

McKenney's knew of the change in requirements and informed McCormick of the new requirements in July 1980. Dave Krzak, Vice President of McCormick, told Williams to proceed with the work. Because the airport was to open in mid-September 1980, and the concrete had to cure for two weeks, with the additional construction width, depth and length, and change in the method of removal of the old concrete, McKenney's had to hire extra workers and work 24 hours per day to finish the contract before opening day. McKenney's sent letters to Whitehead and McCormick outlining the changes. In a letter dated September 4, 1980, Williams (for McKenney's) set forth his problem with the original estimates and compliance with the change in requirements. In another letter of January 16, 1981 to McCormick, Williams listed the original requirements with the unit price, and the change in the requirements with the price charged by him. Williams went to great length in the letter to explain cost increases for concrete removal because of the additional width, depth and length, and method used for removal. Overtime was listed because of the excess work in the same time frame.

With this background, Lundstrom represented Whitehead in a bargaining session with Krzak, for McCormick, in California in February 1981. Krzak and Lundstrom negotiated all claims of the parties for a period of two days and arrived at a written contract and a "TOTAL PRICE: For satisfactory completion of work . . . of $614,125." This figure included an additional $90,325 for McKenney's. Both parties used Williams' letter of January 16, 1981, for basic data and discussion. Lundstrom signed for Whitehead on April 26, 1981. Final

payment on the contract was made by McCormick to Whitehead in August 1981.

In October 1981, McKenney's advised Whitehead they were not satisfied with the additional $90,325 and were contemplating litigation. On May 23, 1984, Whitehead notified McCormick they might request arbitration. On July 20, 1984, Whitehead served upon McCormick a demand for arbitration under the contract signed by the parties. McCormick filed this application for stay of arbitration on August 17, 1984, and Whitehead answered and filed a motion to compel arbitration. The trial court ruled that interstate commerce was involved, the Federal Arbitration Act applied, and granted Whitehead's motion to compel arbitration and denied McCormick's motion to stay arbitration. McCormick brings this appeal following the overruling of its motion for reconsideration. *Held*:

The contract work at issue in this case was performed pursuant to an oral agreement between McCormick and Whitehead. Although McKenney's performed the concrete work in consultation with McCormick's Vice President, Krzak, and their on-site representative, Bob Maier, McKenney's verbal contract was with Whitehead. The original estimate under which the parties undertook execution of this work was made obsolete by changed requirements of the airport engineers. McKenney's informed McCormick of the change in requirements and was told to proceed. McKenney's full exposition of the original requirements and cost estimates, together with the work required under the changed requirements, and charges for that work, were made known to McCormick and Whitehead prior to their February 1981 meeting in California, in which McCormick and Whitehead negotiated all claims and agreed upon a final contract and a total price for all work done. This contract included a provision for general arbitration, and a special clause for arbitration caused by "changes in the work . . . [i]f none of the [included] methods for determining the value of extra work or changes is agreed upon. . . ."

We agree with the trial court that interstate commerce is involved and the Federal Arbitration Act applies. *Hilton Constr. Co. v. Martin Mechanical Contractors*, 251 Ga. 701, 702 (308 SE2d 830). Where one contractor is not from Georgia and the contract is to be performed in Georgia, and material incorporated in the contract work is from out of state, as in the instant case, the contract is one involving interstate commerce within the meaning of 9 USC § 1. *ADC Constr. Co. v. McDaniel Grading*, 177 Ga. App. 223 (338 SE2d 733).

Pretermitting the issue of whether the arbitration clause of a written contract, executed after completion of all work, would relate back to work performed under an oral agreement which did not contain an arbitration agreement, even if the arbitration clause applied, any right to require arbitration was waived. An arbitration clause of a

contract may be repudiated, waived, or abandoned, by either or both parties to a contract. *American Sugar Refining Co. v. The Anaconda,* 138 F2d 765 (7) (5th Cir. 1943), affd. 322 U. S. 42. An agreement to arbitrate is waived by any action of a party which is inconsistent with the right of arbitration. *Commercial Iron &c. Co. v. Bache Halsey Stuart,* 581 F2d 246 (1) (10th Cir. 1978); *Gutor Intl. AG v. Raymond Packer Co.,* 493 F2d 938 (1) (1st Cir. 1974); *Howard Hill, Inc. v. Ga. A. Fuller Co.,* 473 F2d 217, 218 (5th Cir. 1973); *Burton-Dixie Corp. v. Timothy McCarthy Constr. Co.,* 436 F2d 405, 407 (5th Cir. 1971). The conduct of Lundstrom, President of Whitehead, who with full knowledge of the claim of McKenney's including all the increased labor, materials and costs, after completion of all work on the contract, negotiated a final contract and a final price for all contract work with McCormick, is a waiver of any right to insist upon arbitration of disputes which arose under the contract between the contractor Whitehead and its subcontractor McKenney. This conclusion is buttressed by the fact that following negotiations and settlement of all claims by Whitehead against McCormick, and agreement upon a final contract price, and final payment of that contract price in August 1981, no demand for arbitration was made until July 20, 1984, almost four years after completion of contract work, more than three years after agreement had been reached on the disputed issues in the contract, and almost three years after completion of final payment of all work done on the contract.

*Judgment reversed. Banke, C. J., and Sognier, J., concur.*

DECIDED APRIL 16, 1986 —
REHEARING DENIED MAY 5, 1986 — 

*Terrance C. Sullivan,* for appellant.
*J. Ben Shapiro, Jr.,* for appellee.